2022 IL App (2d) 210741-U
No. 2-21-0741
Order filed April 27, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* B.R.-R., V.R.-R., I.R.-R., J.R., Minors | ) ) ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| | | Nos. 21JA30, 21JA32, 21JA29, 21JA31 |
| (The People of the State of Illinois, Petitioner-Appellee, v. Christina R., Respondent-Appellant). | ) ) ) ) | Honorable David M. Olson Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Respondent's stipulation to the State's allegation that her children were neglected did not violate due process where the trial court advised her of her rights and admonished her as to the possible consequences of her stipulation; direct inquiry by the court regarding the voluntariness of her stipulation was not required; despite reports that she had mental health and anger issues, respondent was not shown to be disabled or incapable of knowingly and voluntarily stipulating to a count of neglect. Affirmed.

¶ 2   Respondent, Christina R., mother of the minors B.R.-R., V.R.-R., I.R.-R., and J.R., seeks reversal of the trial court's judgments finding her unable to provide adequate shelter for the minors and placing them in the custody and guardianship of DCFS. Respondent contends that she was denied due process at the adjudicatory hearing because the trial court, despite awareness of her

untreated mental issues, accepted her stipulation to neglect allegations without adequately determining whether her stipulation was intelligent and voluntary. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On April 5, 2021, the State filed petitions seeking to have respondent's four children, born between 2007 and 2012, adjudicated neglected minors and wards of the court. The petitions alleged that the minors' environment was injurious to their welfare in that respondent was recently arrested for attempting to use a knife against her former paramour and was suspected of having substance abuse issues and reportedly had exposed the minors to drug paraphernalia. 705 ILCS 405/2-3(1)(b) (West 2019). The petitions also alleged that respondent had not provided stable housing accomodations in that the family had lived in five diffferent residences since October 15, 2020, had been periodically homeless during that period of time, and had wandered the streets at midnight on November 1, 2020, searching for a place to sleep. 705 ILCS 405/2-3(1)(a) (West 2019).

¶ 5      At a shelter-care hearing on April 13, 2021, DCFS child protection specialist, Jeffery Scace, testified that his biggest concerns with respondent were her "untreated mental health," including "manic behavior"; unaddressed incidents of domestic violence; constant moving around; and inability to accept that she needed help. Respondent testified that she was renting a room for herself and her four children in a single-family residence, in which six other people also resided. She had been there a month and was current in her rent. In lieu of shelter care, the court entered an order of protection and ordered respondent to engage in all service recommendations, including mental health services, that were directed to her and to allow scheduled and unscheduled agency visits.

¶ 6     Sinnissippi Centers, LLC, offered respondent intact family services under contract with DCFS and filed an adjudication report in June 2021. The report included a mental health assessment finding evidence of "General Anxiety Disorder" in respondent's "restlessness, difficulty concentrating, irritability and tension," as well as "evidence of Bipolar." The report recommended that the "court adjudge the minors wards of the State," so that they would "be safe while DCFS placement workers assist[ respondent] in securing stable housing and maintaining a safe environment for the children to return to."

¶ 7     On April 13, 2021, the State also filed an amended petition for adjudication of wardship. Respondent did not appear at the pretrial/status hearing on April 27, 2021. Counsel indicated that respondent was there earlier but had to leave to "get her kids off to school." At the continued hearing on May 11, 2021, respondent expressed exasperation with the hearing process, stating that it was "conflicting with my parental responsibilities, as well as my responsibilities to myself as a person." The court advised respondent that she was not required to appear at any hearings but was entitled to do so. The court further advised respondent that the State would have to prove any allegations, and respondent confirmed that she wished to proceed with the continued representation of the public defender.

¶ 8     In August 2021, Sinnissippi Centers filed an updated adjudicatory report in which it noted, *inter alia*, respondent "appears to have significant mental health issues which are not being consistently addressed."

¶ 9     In September 2021, after several additional continuances, the State filed a second amended petition for adjudication of wardship, adding a dependency count based on respondent's incarceration for failing to comply with anger management counseling in a separate domestic violence case. The next day, at the shelter care hearing,, respondent testified that she was no longer

willing to cooperate with intact services. The court found that it was of "immediate and urgent necessity" to place the minors with DCFS until further order.

¶ 10   An adjudicatory hearing was held on October 12, 2021. Respondent was present and, through counsel, admitted to the State's allegation in the second amended petition that she had not provided stable housing for her four children in that the family had lived in five different locations between October 14, 2020, and April 13, 2021, and had been periodically homeless during that time. The court advised respondent of the rights she was relinquishing and the consequences and responsibilities that she might face as a result of her stipulation. The court then found that respondent made a voluntary and knowing stipulation and the factual basis for the stipulation was sufficient to find neglect.

¶ 11   The matter proceeded to a dispositional hearing at which the court ordered wardship and DCFS guardianship for the minors. This timely appeal followed.

¶ 12                                    II. ANALYSIS

¶ 13   Challenging only the adjudication of neglect on appeal, respondent claims that she was:

> "denied due process of law at the October 12, 2021, adjudicatory hearing when the trial court, although aware of her untreated mental problems, accepted her admission by stipulation to neglect allegations without adequately determining, at least under the circumstances, whether she was intelligently and voluntarily agreeing to the stipulation procedure proposed by her attorney."

¶ 14   "Because of the 'fact-driven nature' of neglect and injurious environmental rulings, a reviewing court will reverse a finding of neglect only if it is against the manifest weight of the evidence." *In re A.L.*, 2012 IL App (2d) 110992, ¶ 13 (citing *In re N.B.*, 191 Ill. 2d 338, 346 (2000). A ruling is against the manifest weight of the evidence only if the opposite conclusion is clearly

evident, and "given the delicacy and difficulty of child custody determinations, the discretion vested with the trial court is even greater than in an ordinary appeal applying the manifest-weight-of-the-evidence standard of review." *Id.*

¶ 15    Termination of parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/1-*1 et seq.* (West 2020)) involves two stages. First the court determines, by clear and convincing evidence, whether a minor should be removed from his or her parents and made a ward of the state. 705 ILCS 405/1–1 to 7–1 (West 2020); the Adoption Act (750 ILCS 50/1(D) (West 2020)) (listing the grounds of parental unfitness). During this stage, if the trial court finds abuse, neglect, or dependence, it conducts an adjudication of wardship. The second stage of the termination process requires the court to hold a second hearing to determine, by a preponderance of the evidence, whether it is in the best interest of the minor to terminate parental rights.

¶ 16    Since a termination proceeding seeks to end the parents' fundamental liberty interest in raising their children, the procedures involved must meet the requisites of the due process clause. *In re M.H.*, 196 Ill. 2d 356, 363 (2001); *A.L.*, 2012 IL App (2d) 110992, ¶ 14. In determining what due process requires, courts are to consider three factors: (1) the private interest affected; (2) the risk of erroneous deprivation of the interest and the probable value of additional procedural safeguards; and (3) the government's interest, including financial and administrative burdens in providing procedural safeguards. *Id*.

¶ 17    At the first, or adjudicatory, stage of a termination proceeding, a parent's private interest in raising her child is mitigated by the fact that there is not a final or complete severance of the parent-child relationship and by the numerous opportunities the parent will be afforded over a lengthy period of time to regain custody. *In re April C.*, 326 Ill. App. 3d 225, 237 (2001); *In re A.A.*, 324 Ill. App. 3d 227, 239 (2001). The risk of erroneous deprivation of the parent's interest is

procedurally safeguarded by: (1) the lower level of proof at the adjudicatory stage (preponderance of the evidence) than at the termination stage (clear and convincing evidence), and (2) the opportunity at the second stage to present evidence and correct any errors that may have occurred at the earlier stage. *A.A.,* 324 Ill. App. 3d at 239-40; *A.L.*, 2012 IL App (2d) 110992, ¶ 19. Finally, our courts have held that the state has a "compelling interest in expediting the first-stage adjudicatory hearing so as to act in a speedy and just manner to determine the best interests of the minors." *A.A.,* 324 Ill. App. 3d at 240; *A.L.*, 2012 IL App (2d) 110992, ¶ 18.

¶ 18     This court has specifically held that due process does not require the trial court to admonish a respondent in a termination-of-parental-rights proceeding regarding the consequence of her admission to unfitness or to inquire regarding the voluntariness of her admission. See *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 34 (declining to expand the requirements for acceptance of an admission in a criminal proceeding to admonishments in a termination-of-parental-rights proceeding). Respondent acknowledges our holding but nonetheless asserts that, in this case, the trial court was required to inquire whether respondent's stipulation was voluntary because the record showed that there were concerns about her mental health. To support her assertion, respondent cites to *In re Johnson*, 102 Ill. App. 3d 1005 (1981), for the proposition that a neglect stipulation "must be intelligently and voluntarily made; that is, it must be apparent from the record that the party making the admission was aware of the consequences of [her] admission—that a finding of neglect gives the court jurisdiction of the minor who then becomes subject to the jurisdictional powers of the court." *In re Johnson*, 102 Ill. App. 3d at 1013 (1981).

¶ 19     *Johnson*, however, does not support respondent's contention that her mental condition required the court to address her directly regarding her stipulation. Nor is her contention supported by the other cases she cites on appeal, none of which involved a respondent with alleged mental

health issues. See *In re Moore*, 87 Ill. App. 3d 1117 (1980); *In re M.H.*, 196 Ill. 2d 356 (2001); and *In re April C.*, 326 Ill. App. 3d 225 (2001). While the reviewing courts in all of these cases found that admissions at the adjudicatory phase must be voluntarily and intelligently made, none held that direct inquiry was necessary. Still, the decisions contain helpful indicia for determining whether a respondent's stipulation was intelligent and voluntary.

¶ 20    Applying the indicia here confirms that respondent was not denied due process. The petition itself clearly stated that the State was seeking to have the minors adjudicated wards of the court. See *Moore,* 87 Ill. App. 3d at 1121 (reversing for a new adjudicatory hearing where the petition failed to apprise the respondent that she could lose permanent custody of her child). Respondent was represented by counsel at all relevant times and does not allege that her attorney was ineffective or failed to explain the nature and ramifications of the procedure to her. See *April C.*, 326 Ill. App. 3d at 242 (finding these factors "significant" in the court's determination that the respondent's stipulation was intelligently and voluntarily given). Moreover, respondent's attorney advised the court, with respondent present, that they had discussed the matter and wanted to proceed to disposition, and the trial court admonished defendant as to the possible consequences of her stipulation. See *Johnson*, 102 Ill. App. 3d at 1012-13 ("neither the trial court nor counsel explained the consequences of the admission to the respondent").

¶ 21    Despite reports that respondent had some mental health and anger issues, nothing in the record suggests that respondent was disabled or incapable of knowingly and voluntarily stipulating to a count of neglect. Respondent herself rejected such a notion and, notably, makes no claim on appeal that she did not understand the consequences of her stipulation.

¶ 22    Nor does respondent suggest that the factual basis for her stipulation—her failure to provide adequate shelter for her children—was insufficient to establish that her children were

neglected. As the State points out, this is "especially relevant" as "the knowing and voluntary requirement protects a parent from admitting to neglect or abuse when their conduct does not fall within the State's allegations." *M.H.*, 196 Ill. 2d at 366.

¶ 23 We found no intention of the supreme court in *M.H.* to require a trial court to inquire regarding the voluntariness of a respondent's admission. See *Tamara W.*, 2012 IL App (2d) 111131, ¶ 34. We see no reason to disturb that holding today.

¶ 24                                   III. CONCLUSION

¶ 25 For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 26 Affirmed.